Mr. Hanson, good morning. Good morning, Your Honors. May it please the Court, my name is Andrew Hanson. I represent Plaintiff Appellant Mr. Walter Tuvell. I'd like to request the reservation of three minutes of my time for a rebuttal. You may. Thank you. In our reasons why oral arguments should be heard, we mentioned two. First, whether an employer may reject applications for job transfer from an employee on short-term disability leave precisely because that employee is on short-term disability leave. And second, the Catch-22 issue. Namely, whether an employer may keep insisting that an employee can return to work for his harassing supervisor but is not a qualified disabled person eligible for a job transfer. I'd like to start today by discussing each of these questions in the context of Mr. Tuvell's rejected job transfer applications. Turning first to the Catch-22 issue that was created by IBM and endorsed by the District Court, the question is, was Mr. Tuvell a qualified disabled person? Yes, he most certainly was. On January 24, 2012, while Mr. Tuvell was still employed at IBM, attorney Larry Bliss, counsel for IBM, wrote to Mr. Tuvell's lawyer, The ADA does not require IBM to transfer Mr. Tuvell or change Mr. Feldman as Mr. Tuvell's manager as a reasonable accommodation since Mr. Tuvell is capable of performing the job. This should end the debate. IBM took the position that Mr. Tuvell was a qualified disabled person who could do his current job, so of course he should be eligible for a job transfer. Now, however, IBM moved for summary judgment, arguing there was no genuine issue of material fact that he was not a qualified disabled person capable of performing his job or any job, and this should not be permitted. Even if this Court finds that IBM can change its position 180 degrees like this, IBM nevertheless took the position that Mr. Tuvell could perform his job and Mr. Tuvell was steadfast that he could return to work with IBM with a new supervisor or in a new role, and his medical reports supported that he could, and he performed well in his interviews at the time. At the time he was trying to get a transfer, he performed well. So there's actually no dispute that he was a qualified disabled person. At the very least, if all the parties agreed that he was capable of performing his job or a new job with an accommodation, surely a jury could decide the same thing. If there were any other result, it would be an unlawful catch-22. Having established that Mr. Tuvell was a qualified disabled person, we can turn now to the second question of whether IBM's justification for denying his transfers was unlawful. The first rejection for transfer to the 579 position came in writing on January 6, 2012. Specifically, the hiring manager, Chris Kine, wrote to Mr. Tuvell, quote, I underestimated the difficulty of moving forward with bringing you to the team. We cannot move forward with taking you directly from being on short-term disability. This will receive very close scrutiny from the operations people in the organization. This is direct evidence of discrimination. It's direct evidence of retaliation for taking a disability leave, and it was an unlawful failure to provide reasonable accommodation. It thus supports the conclusion that summary judgment was improperly granted on counts 2, 4, 5, and 6. We cited Sensing the Outback Steakhouse in this context on page 41 of our first brief. That's the first circuit case from 2009 that supports a number of Mr. Tuvell's claims and arguments, and it's cited throughout our briefs. Now, in terms of Mr. Kine's rejection for Mr. Tuvell's transfer showing unlawful animus, IBM doesn't even address this issue in its brief, and neither did the district court. That's on pages 20 to 22 of the addendum. The district court avoided that discussion by holding that the rejections for transfer were not adverse actions. I want to address this point. As a result of the two rejections for transfer, Mr. Tuvell's income went from two-thirds to zero. On page 160 of the Sensing... I'm sorry. I understood the reason for termination of his employment to be different. You've not yet talked about that. Would you address that, please? He's on short-term disability, according to the company records. In the meantime, the company sees that evidence that he is, in fact, working someplace else, and at that point they ask him about it, and he refuses to give information. And they essentially ask again, and he refuses to give information. And at that point, he is terminated. Is that basically correct? That covers some of the facts involved in the termination. Yes, I'm asking about the termination. So one of the facts you mentioned is that he was working at another company, and for starters, that helps support the finding that he was a qualified disabled person because he was working. That's beside the question that was asked by Judge Lynch. In terms of termination and communications that were back and forth at that time, Mr. Tuvel was more than willing to assuage their concerns that he was not working for a competitor. What's in the record? I hear your characterization of it. He said, you can go online and find out just as well without asking me, essentially. I'm not sure which fact you're referring to. Answer my question, please. In terms of the animus at the termination. No, go back. What were the reasons for his termination? IBM's alleging that he was unwilling to provide the name of his other employer. And the concern stemmed from, was he working for a competitor? And under the company policies, you only have to disclose other work if it is for a competitor. And he wasn't working for a competitor, and he was willing to have a third party, first of all, convince them he was not working for EMC, as they had first alleged, and second, that he was not working in a competitive capacity. And there's plenty of evidence that the whole approach that they took at this time was in retaliation for all of his complaints. In fact, on May 11th, that's the date that IBM submitted its position statement at the MCAD, that's the very same day it ramped up its questions of Mr. Tuvel, and trying to find an excuse to be able to terminate him. Doesn't the record say on his LinkedIn page that he was working for EMC, which is a competitor? It appears that there was information on his LinkedIn page that indicated that. He had worked for EMC previously. IBM knew about that. He hadn't touched his LinkedIn page for years. So there's evidence in the record that he did not put that in there, and he doesn't know how it got there. It is his page, but he hadn't looked at it or touched it for years. But that doesn't make it unreasonable for IBM to ask him about it or to demand information. But if their concern was, are you working for a competitor, why wouldn't they be comfortable with a third party neutral, you know, addressing those concerns? He's still out on leave from employment with them. He's still their employee. Right. Why should they have to go through third parties when they have a right to get the information directly from an employee? He had valid concerns that they were going to jeopardize his employment there. There was a lot of retaliatory, discriminatory animus behind the scenes by a lot of different figures at IBM. I'd like to get into that. But first I just want to follow up on the issue of not the termination as an adverse action, but the rejected transfers. Yes, we've heard you on that. I'd like to hear a bit more on the termination. You've attributed to IBM knowledge of your client's reactions. On what basis? What reactions are you referring to? To his refusal to reply to a request for information from his employer. I'm sorry, could you ask the question again? You've admitted that IBM asked him for information about his LinkedIn page. I believe you have admitted that he refused to give them that. You then suggested that your client had good reason for doing so. I've said, how did the employer know what those reasons were? Did he communicate them? Did he say, I'm sorry, I can't give you that information for some reason? He did. He indicated that he was fearful that they would retaliate against him and interfere with that employment. If we find that's not retaliation, that's a perfectly legitimate request for information, then what argument do you have? Normally, certainly, of course it's a legitimate request for information. But in the circumstances of this case, with the long history that had gone on before it. Because they knew he said he had PTSD, is that the answer? No, it's not solely because he had PTSD. It's because all of the decision makers involved in whether he should get a reasonable accommodation, whether he has legitimate complaints, all of those decision makers displayed animus throughout the process. So IBM, or his employer, is supposed to attribute to themselves animus, and know from that that this request for information was an illegitimate request? Not that it was an illegitimate request, but if their main concern was, are you working for a competitor, why isn't it sufficient for somebody to convince them that he's not? Because it's on his LinkedIn page. First of all, they went out and sought his LinkedIn page. They found it. So he didn't deny what was on there. He didn't try and hide anything. He just said, I didn't put that on there. I don't know how it got there. I'm not working for EMC. I'm not working for a competitor. You've reserved some time. Thank you. Thank you. Good morning. May it please the Court, my name is Matthew Porter, Counsel for Defendant Apelli, International Business Machines, with me is my colleague Ann Selinger. We submit that the District Court's dismissal of the amended complaint was correct in every respect. It should be affirmed. As this Court said about a month ago in the Lange case, sometimes the simplest way to decide a case is the easiest way, or the best way, rather. And I think that's the case here. And the District Court got it right that Mr. Tuvel was not a qualified handicapped individual. He was not able to perform the essential functions of his job. And in making that decision, the District Court was looking at three different things. First of all, with the medical treatment reports submitted by Mr. Tuvel's own treating professionals. First, a nurse practitioner for the first two months in August and September of 2011, followed up by his social worker, who was his mental health counselor, Stephanie Ross, who prepared MTRs for September through December of 2011. And in each of those MTRs, he was described as totally disabled from working. These were the basis upon which he sought and received short-term disability. And more to the point, because there's a questionnaire on the second page, which is in the record, he was described as severely impaired in his ability to manage conflict with others, his ability to get along with others without behavioral extremes, and his ability to interact and actively participate in group activities. And we really do see that in the record of this case over and over and over again. So one of his last reports, though, said that he could, it was a little bit tentative, I submit, but that he could perhaps go back to work if he had a new supervisor and had a different work location. It did. So the question is, why wouldn't that be a reasonable accommodation? Well, under the circumstances, she did, Ms. Ross, the mental health professional, did say that in that last one. When she was deposed, she said it was only possible. And she was describing the idea of possibly a different supervisor or a different setting, one or the other of those things. And if you look at the record of different supervisor, by that time, we actually had a pretty clear vision of Mr. Tuvel's idea of what a different supervisor might look like. It wasn't anybody he ever identified. He admits that. He never identified a new supervisor. But by that point in December, he had a laundry list of individuals who he had described variously as wrongdoers and evildoers who had caused tremendous problems to him in the workplace, including everybody from his direct supervisor, Mr. Feldman, all the way up to the chairman of the company, Sam Palmisano, who we're still not quite sure why he's identified as a problem in this case, other than the fact that he did receive at one point Mr. Tuvel's unsolicited complaints about his workplace. It was about 300 pages of documents. He testified he spent 22 hours a day on these over two to three weeks. And they just listed item after item after item. But the reality is when you look at the record of the case, by that point, it wasn't that these came in a vacuum, because we did have Mr. Tuvel starting from the very beginning of his time with IBM, about five months into his tenure, so May of 2011, he has a very, very minor workplace interaction, the kind of thing that under any objective standard, and we must apply objective standard here, was benign at most. His boss comes to him, professional to professional, two senior software developers, and they discuss Mr. Feldman's ideas. Let's talk about the fact that our internal customer, Mr. Cannabi, is not satisfied with the deliverables. Now, it wasn't a big issue. It was something about either the software deliverable being in an Excel spreadsheet or not, whether it was quite on time or not. So you had that, and so they sat down to talk about it, and Mr. Tuvel's response was really remarkable. Rather than engaging in a professional conversation, he nearly accuses Mr. Cannabi of being a liar and having some sort of ulterior motive behind this and not knowing what he's talking about. So that conversation went nowhere. Now, if we just stop there, maybe we'd be okay if things improved from there. But a couple weeks later, Mr. Cannabi and Mr. Tuvel are again going over a software issue. Again, an ordinary workplace interaction, people working together, and what happens? Voices are raised, Mr. Tuvel leaves the meeting, and then sends a scathing email, again attacking Mr. Cannabi. Personally, with a lot of suggestions of harassment and defamation and all those kinds of things. So IBM at that point says, you know what? These two aren't working well together. So let's move Mr. Tuvel from the Cannabi work to another set of work within Mr. Feldman's purview, and we'll switch him over with another employee. Again, not an unusual situation to go when you're working with internal clients within an organization like this. But the response is interesting. Mr. Tuvel immediately jumps to the conclusion that this change must be race, age, and gender discrimination. Why? Because he's being replaced or substituted with a woman who's South Asian and female and slightly younger than him, or actually quite a bit younger than him. So that's his immediate default reaction. Not disability discrimination, but these other things. And then, again, we're not making a lot of progress here in terms of the interpersonal relations between Mr. Tuvel and Mr. Feldman, where Mr. Feldman is just trying to manage his group professionally. But then when Mr. Feldman comes to Mr. Tuvel and Ms. Mizar, the person he's being replaced with, and says, I just need transition memos from the two of you about your handoff of the work, Mizar gives hers no problem. Tuvel doesn't. And when Feldman says, in case I wasn't clear, I need one from you too, his response is to go to human resources and say, I'm done with this guy. I can't work with him anymore. He's harassing me. He's engaging in defamation, intentional infliction of emotional stress, and the whole rest of it. And it never changes from that time on, in terms of his position on this issue of working with this supervisor, except, as I mentioned, he expands the group. And that's entirely consistent with what Ms. Ross said in her deposition testimony, as well as in her long-term disability appeal, all the way in September of 2012, after he's been working for this new company for a few months, been long gone from IBM. And she says, she's still talking about the fact that he was totally disabled, couldn't work in the workplace. And when she was asked about this in her deposition, she described it. She said, Mr. Tubell, if he just goes near IBM, within 20 to 50 miles of the location where he worked, he becomes hysterical. If he talks about the workplace, he becomes upset and obsessed. And most disturbingly, she says that if he just sees Feldman or Kanabi, just sees them, and the district court noted this, this idea that even if he got transferred to a new location, there was no guarantee he wouldn't see Feldman, Kanabi, he wouldn't have to interact with all these people he's identified, including Diane Adams of Human Resources, Russell Mandel in the appeals department. If he just sees Feldman or Kanabi, it could trigger obsessive thoughts, depression, or other strong reactions. And we actually have, from Mr. Tubell's own testimony, a vivid example of what those other strong reactions might look like. He testified that he drove to the gas station he used to patronize when he was commuting back and forth to work, and just being at the gas station that he used to go to. Counsel, actually, we have read the decision. Could you meet some of your brother's arguments? One has to do with what he calls the change in IBM's position from you're qualified to you're not qualified. Well, I think this is where the case becomes circular, is that by the time we, he's referencing this e-mail between Mr. Bliss, who is the IBM in-house lawyer, and Mr. Tubell's then lawyer, Mr. Mantel. And in that e-mail, Mr. Bliss is actually restating the position that Mr. Tubell has taken in his various e-mails, which is, there's nothing wrong with me. It's just, I can do this job, it's just the supervisors harassing me. And so what Mr. Bliss is basically saying is, look, we've done the investigation. We did the investigation originally with Ms. Dew. We did the investigation in the follow-on with Mr. Mantel, or Mr. Mandel, excuse me. And as a result of those investigations, there has been no harassment by any objective standard. Nothing's happened to you. Okay, what about the denial of the two transfers? Well, there was only, it was essentially, the first time he applied for the position, it wasn't within the context of an accommodation. It was simply Mr. Tubell reaching out on the GOM, the Global Opportunity Marketplace website, and applying for a job. He did interview for the job, and he didn't get the job. And that's because the hiring manager for that position, when he was interviewing him, it was pretty clear during the course of their conversations and some of the e-mails back and forth that Mr. Tubell was looking for higher-end development work. This was kind of a low-level maintenance for a mature product. And Mr. Keim, the gentleman who was interviewing for the position, who was a relatively new manager down in Austin, Texas, managing remotely, concluded based upon his interactions with him that this was not going to be a good fit for Mr. Tubell. This was not the kind of work he was looking for. As evidenced by the fact that he was working on the Wahoo work for Mr. Kanabi, he said, that's the kind of work I want, that high-end significant developer work. So now we're way down from that. It doesn't explain why there's a statement about him coming back in short term. That doesn't explain it. No. No, but if you look at the e-mail itself, he does... So you want to explain that one? I will, Your Honor. And I just want to note in that e-mail that he sends that we're speaking about from January, that, in fact, Mr. Keim specifically references that discussion I just had about the reason why he didn't think he'd be interested in the work. As far as the short-term disability piece of it, what he says and what Mr. Keim was opposed on this, and what he testified about in what is admittedly a clumsy e-mail, is that because Mr. Tubell was in somewhat of a unique situation, although with a company the size of IBM, I'm not sure how unique, he'd only been there for less than a year. And so he hadn't received yet a PBC, a performance evaluation. And so Keim didn't have a piece of paper to give to his bosses to say, this is the review from the manager. And Keim was not working alone. He was working in conjunction with his upline managers because, again, he's a relatively younger manager. And so he's saying that the complicating factor for him is that he can't just give to his managers the review and say, this is how the guy did. Instead, he needs to be incorporating additional elements in terms of getting feedback from his current manager verbally and then transmitting that to his boss. And the feedback that he received from the manager was not 100% favorable for sure. On the technical side, it was actually very good because no one's ever questioned Mr. Tubell's ability to program. But on the side of interpersonal relations, again, the things that we've talked about in the record, the things that were talked about in his MTRs, he did have difficulty engaging with his coworkers. And that was what Mr. Keim testified to when he said there was a difficulty about taking him directly from short-term disability. Not that taking him from short-term disability was a disqualifier. It just made it more of a complicating factor. I'd also note that Mr. Keim, when he first was approached by Mr. Tubell... Yeah, but why would that be a complicating factor? It just made it more... There's a difference between having to get an oral evaluation versus a specific mention of disability coming up as an issue for disqualification. That's right. He's not saying that. I don't think he's saying that it's a disqualifier for him coming up with short-term disability. In fact, I note that when he first engaged Mr. Tubell, when Mr. Tubell first approached him about the position, Mr. Tubell mentioned to him specifically that I'm coming off of short-term disability. And yet, even under those circumstances, Mr. Keim didn't say, okay, we're done here. He went through the interview process with him at that point. And he took him all the way through the process. So it was never a disqualifier from Mr. Keim's perspective. And as he testified, they never had a conversation about what this disability might be or what was happening with Mr. Tubell. I also note that Mr. Tubell actually misled, not that it's material, but to Mr. Keim's decision. But in his email to Mr. Keim, Mr. Tubell said, I have a clean bill of health as of early December of 2011. He did not have a clean bill of health at that point by the admission of his own MDRs. You heard a rather extended dialogue about the circumstances of termination. Could you go through that, please? Yes, Your Honor. It's really interesting. IBM is in a situation where, as of May of 2012, they're still attempting to engage in the interactive process with this employee. Mr. Tubell's long-term disability had been denied. And IBM said in April, okay, you can continue on, appeal the long-term disability denial, and we'll hold your position open, and we're willing to still continue to talk to you about reasonable accommodations under the circumstances. And so that's where IBM is. Now, while IBM's having this conversation with Mr. Tubell, he's already working somewhere else as of a month earlier. And so, unbeknownst to IBM, so when May comes around, and somehow they find out that there's this LinkedIn page with the EMC reference on it, saying from a certain date to present, meaning to the date, they went to him and said, well, this is a problem for us that you'd be working for EMC, a major competitor of IBM. Are you working for EMC? No, I'm not working there. And he said, I won't tell you where I'm working. IBM says, well, we need to know where you're working in order to make a determination whether it's competitive employment. He says, I'm not going to tell you that. And they said, well, and then at that point, and this is very interesting, because it goes to the issue of his qualified handicapped status,  This is defamation and harassment. Defamation and harassment? We submit that on that basis, the determination decision was rightly made. Thank you. I'd like to respond to a few of those points. First of all, my brother used the word wrongdoers as if to suggest that it was not reasonable for Mr. Tuvel to view the conduct that he was exposed to as wrongdoing and that he wasn't justified in fearing further wrongdoing. And then let's focus on the failed transfers, because there was discussion of who made the decision. It wasn't Mr. Keim on his own deciding that Mr. Tuvel shouldn't get the job. Mr. Feldman, his manager, poisoned it. There's evidence in writing. The live chat on December 13th, the conversation was over. Mr. Keim thanked Mr. Feldman for his time and candor. Mr. Feldman then volunteers his own question. He asks himself his own question, would you hire him again? And he says no. So he adds this to the end of the conversation, poisons the chances that Mr. Tuvel is going to get the transfer. Two days later, in another live chat, Mr. Keim writes to Mr. Feldman, quote, based on your feedback, I don't think we will be able to move forward. Now, there's a reference to we can't get a performance rating for Mr. Tuvel. On March 30th, 2011, he had gotten a performance review and it was a 3.5 rating. This is on page 749 of the appendix. And what a 3.5 rating means is that it's between acceptable average good and above average. So that was his performance rating. Then two months later, he tells Mr. Feldman he has PTSD. Then everything changes. What happens after that are not regular workplace interactions. It was defamation. It was demotion. It was threats of termination just for making complaints of discrimination. And Mr. Feldman was right involved with it throughout the process. Some of the comments he made are just direct evidence of animus. On June 12th, two days after he demoted Mr. Tuvel, he says he quotes his history of suing when you feel you've been wronged in the office. Two weeks later, after the first investigation closed with the denial of Mr. Tuvel's complaints, Mr. Feldman puts in writing, quote, assertions of bad faith are inconsistent with success. Three weeks later, while Mr. Tuvel is now on short-term disability leave, he communicates to his boss in HR. He says let's suspend all of Mr. Tuvel's access because, quote, my concern is he's establishing the prima facie basis for a claim of accommodation. So this is a manager actually saying I'm concerned that he's establishing a prima facie basis for an accommodation. There was a reference to Mr. Mandel and the investigations. Mr. Mandel was the head of the Concerns and Appeals Program. He was handling all the open-door complaints. What did he say to misdo the first investigator as he was telling her to deny his complaint? He said, quote, no need to place him in another role. Like a tantrum for a two-year-old, they will learn to do it again if you give in to what they need. So before he even begins his investigation, he realizes that Mr. Tuvel needs an accommodation, but he won't do it. Your time is up. Thank you.